IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff/Respondent, | § | |
| | § | |
| V. | § | CR. No. C-02-208 |
| | § | C.A. No. C-05-260 |
| RIGOBERTO QUINTANILLA, | § | |
| | § | |
| Defendant/Movant. | § | |

**MEMORANDUM OPINION AND ORDER GRANTING
MOTION TO VACATE SENTENCE AND ORDERING RESENTENCING**

Pending before the Court is movant Rigoberto Quintanilla's ("Quintanilla") motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255, which was filed by him *pro se*. (D.E. 57.)   Quintanilla has since withdrawn most of the claims raised therein, leaving only his first claim.  In that claim, Quintanilla argues that he was denied the effective assistance of counsel.  Specifically, he claims that his counsel, Jack Wolfe, allowed him to plead guilty without first asking the Court to specifically enforce his cooperation agreement and to require the government to move for a downward departure based on Quintanilla's cooperation.  The government maintains that it retained sole discretion as to whether to move for a downward departure and that it was justified in not doing so because Quintanilla engaged in illegal or unauthorized activity while cooperating.

The court has considered all of the written submissions of the parties, as well as the

1

testimony and argument from the August 23, 2006 evidentiary hearing, at which Quintanilla was represented by appointed counsel, Assistant Federal Public Defender Jose Gonzalez-Falla.  For the reasons set forth in more detail herein, the Court GRANTS Quintanilla's motion.

It concludes that Quintanilla's counsel in the underlying proceedings was constitutionally ineffective because he failed to argue to the Court, prior to allowing his client to plead guilty, that the government had bargained away its discretion as to whether to move for a substantial assistance departure as part of the oral cooperation agreement. Had Quintanilla's counsel made such an argument and requested specific performance of the agreement prior to allowing Quintanilla to plead guilty, this Court would have required the government to move for a downward departure in Quintanilla's sentence at sentencing. Put differently, the Court concludes that the government bargained away its discretion and then breached its oral cooperation agreement by not moving for a downward departure for substantial assistance.  The proper remedy is to require the government to move for a reduction in sentence, and to hold a resentencing hearing in order to allow the Court to evaluate the government's motion.

## I.  JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

**A.      Factual Background**

**1.        Underlying Offense[1]**

The indictment against Quintanilla arose as a result of a drug seizure at the Falfurrias, Texas U.S. Border Patrol Checkpoint.  On April 15, 1999, Guadalupe Bocanegra entered the checkpoint driving a 1993 Peterbilt tractor with a 1992 trailer.  Bocanegra's wife, Sandra Garza, was also in the vehicle.  While conducting an immigration inspection, an agent noticed that when he asked Bocanegra if anyone else was in the vehicle Bocanegra did not reply and was preoccupied with looking in the mirror at another agent who was conducting a canine search of the vehicle.  The agent also noted that Bocanegra became extremely nervous while observing the canine search.  The canine alerted to the front left corner of the trailer.  The agent asked for and received permission to further inspect the vehicle, and Bocanegra was instructed to park the vehicle in the secondary inspection area.

Once in secondary, the agents discovered approximately 2,618 kilograms of marijuana in the trailer of the truck, with an estimated value of $4,684,800.  Bocanegra was arrested and advised of his rights.  He initially told agents that he knew nothing about the marijuana nor did his wife.  On the same date agents with the Drug Enforcement Administration arrived at the checkpoint and advised Bocanegra of his rights.  Bocanegra

---

[1]  The factual background is taken from the Presentence Investigation Report ("PSR") at ¶¶ 4-12.

informed them that Quintanilla had offered him $100 per pound to transport 100 pounds of marijuana to Richmond, Texas.

When he was interviewed by the United States Probation Office, Bocanegra further stated that he had transported two loads of marijuana for Quintanilla prior to being arrested. According to Bocanegra, Quintanilla purchased Bocanegra a tractor trailer for $20,000 and Bocanegra was going to pay him $2,400 per month for the tractor. Quintanilla advised Bocanegra that he could work off the $20,000 by simply transporting three loads of marijuana partially owned by Quintanilla consisting of 200 pounds per trip. Bocanegra told the Probation Officer that he refused the offer and advised Quintanilla to take the tractor trailer, but that Quintanilla refused, instead threatening that Bocanegra's family "would be introduced to a 9mm or 45mm if he refused." (PSR at ¶ 7.)

Bocanegra also gave information about the prior two loads, including the fact that: (1) as to the second of these loads, Quintanilla had told him that he did not need to worry because law enforcement officers would keep an eye on Bocanegra and guarantee his arrival at the location in Houston; and (2) the fact that a police unit was located where the marijuana was being unloaded and appeared to be working as a "lookout." Bocanegra recounted that Quintanilla instructed him as to where the marijuana would be loaded, where it would be unloaded, and when to arrive at the specified locations. He also stated that Quintanilla had helped load the marijuana, along with five other individuals.

Prior to Quintanilla being indicted, AUSA Patti Booth and a DEA agent met with

4

Quintanilla and his counsel, Jack Wolfe, in order to give Quintanilla an opportunity to debrief or to offer substantial assistance to the government. (D.E. 92, Transcript of August 23, 2006 evidentiary hearing ("EH Tr.") at 35-38.)   Quintanilla indicated that he did not want to cooperate.  After being indicted in Crim. No. C-99-384, however, Quintanilla reconsidered. (EH Tr. at 41-44.)

###### 2.    The Formation of the Cooperation Agreement

During a meeting in 1999, at which AUSA Booth, defense counsel Jack Wolfe, Quintanilla and DEA Agent Doug Irr were present, Quintanilla proffered the information that he had concerning the offense. Quintanilla informed AUSA Booth that an individual named Eleazar Morin was involved in the offense.  Morin was an individual who Booth knew had previously been a large drug trafficker in the Rio Grande Valley, and had been convicted and subsequently released from prison. (EH Tr. at 46-47.)  Once Morin was mentioned, Booth was very interested in Quintanilla's cooperation because she knew "Eleazar [Morin] was well connected in Mexico" and "if Rigoberto Quintanilla was dealing with Eleazar then it was big." (EH Tr. at 48.)  She also recalled he mentioned something about a "bunch" of corrupt police officers in the Valley. (Id.)

Booth offered to dismiss the indictment against Quintanilla, in exchange for a written confession that Quintanilla would agree could be used against him when he was re-indicted on the same charges.  The dismissal of the indictment would allow Quintanilla to provide assistance to the government without tipping off those he would be interacting with. (EH.

Tr. at 50-52, 54-55.)

There was no written agreement concerning the cooperation.[2]  Booth testified that she

did not think she enumerated what Quintanilla would have to do in order to reach the level

of substantial assistance.  She said that Wolfe knew "exactly what it would take, and he,

and Rigoberto Quintanilla was law enforcement and I didn't have [sic] go through and

explain to him what he – because he already knew, Jack already knew what was going to

be required."  (EH Tr. at 52.)  Instead, the agreement that was reached, according to Booth,

was that the government would give Quintanilla an opportunity to provide substantial

assistance and "implicit" in this was that he would continue to cooperate and stay "out of

trouble."  (EH Tr. at 56.)

Wolfe's testimony on what was said during the meeting was more specific.  Prior to

Quintanilla's sentencing, but after his rearraignment, Wolfe filed an affidavit in support of

a motion asking for specific performance of the plea agreement.  (D.E. 18.)   In that

affidavit, Wolfe testified that the agreement was that "if [Quintanilla] cooperated, worked

for the government and provided substantial assistance that the government would help him

out, protect him and get him a reduced sentence."  (D.E. 18, Wolfe Aff. at 1.)  Wolfe

further testified that, after the meeting, AUSA Booth said that if Quintanilla "only did Morin

---

[2]  Wolfe is the former head of the U.S. Attorney's Office in the McAllen Division.  Booth testified that Wolfe had played a role in Booth getting a job as an AUSA in McAllen in 1989 and had been her "mentor."  (EH Tr. at 39.)  She testified that she and Wolfe had a "pretty good working relationship," and "one that was based on trust and mutual respect."  (EH Tr. at 39-40.)  Presumably, their close relationship was part of the reason why no written agreement was executed.

that he would get the 5k departure without any problem." (D.E. 18, Wolfe Aff. at 2.)

Notably, Wolfe also disputed that implicit in the cooperation agreement was an understanding that Quintanilla would not commit a further crime:

> THE COURT: Don't you think implicit in that [agreement] would be that he would not commit further crime?
>
> MR. WOLFE: That was never ever stated to me, and I understand the common rule –
>
> THE COURT: Have you ever as a prosecutor –
>
> MR. WOLFE: You're absolutely correct.
>
> THE COURT:  – offered a plea bargain in which a part of that agreement was that you would continue to obey the law and you would not commit other federal crime?  Nor have you ever seen one as the defense lawyer.  And you knew that –
>
> MR. WOLFE: No.  When we used to do just a handshake, that stuff was never talked about.  It wasn't until recent years when the written plea bargain came out that that was put in from the Houston Division and I assume from the Department of Justice. But prior to that time, that was never stated, Judge.  And that wasn't stated in this particular case. ...

(D.E. 39, Transcript of December 30, 2002 Sentencing Hearing ("S. Tr.") at 38-39.)

Despite these differences, the parties clearly agree that there was an oral cooperation agreement, and that it contained both an understanding that the government would move for a downward departure if Quintanilla provided substantial assistance and some sort of understanding that Quintanilla would "stay out of trouble."  (EH Tr. at 56, 168; D.E.  98 at 4 (defendant's brief acknowledging same); D.E. 99 at 4, 8-9 (government's brief

acknowledging same).)

At a closed hearing held on January 31, 2000 before United States District Judge Janis Graham Jack, Judge Jack agreed to dismiss the indictment against Quintanilla. During that brief hearing, AUSA Booth stated that the government intended to refile the indictment based on Quintanilla's confession, and that Quintanilla understood that. (D.E. 70 at 2-3.) She further informed Judge Jack that she anticipated a "plea date about three months down the road." (D.E. 70 at 3.)

### 3.      Quintanilla's Cooperation

Although AUSA Booth had told Judge Jack that the cooperation should last about three months, Quintanilla was, in fact, not arrested again until June 20, 2002,[3] nearly seventeen months later. During that time, the government does not contest that Quintanilla's cooperation resulted in arrests and convictions of other individuals, as well as significant drug seizures. As outlined by the undisputed affidavit of Quintanilla's trial counsel, his cooperation resulted in: (1) the separate seizures of 600 pounds and 800 pounds of marijuana, which also resulted in the indictment of Eleazar Morin, who was considered a "major player" in drug trafficking in the Rio Grande Valley and who had extensive contacts in Mexico; (2), an arrest of another individual and the seizure of 5 ounces of heroin and one

---

[3]    AUSA Rodriguez contended that he learned in approximately November 2001 of Quintanilla's allegedly illegal activity, and that he made the decision at that time to discontinue using Quintanilla in any investigations. The government has not explained why it did not arrest him until eight months later.

of cocaine; (3) a seizure of $250,000 and 30 pounds of cocaine as well as the arrests of an

unknown number of defendants; (4) the arrest of Javier Barajas and the seizure of 1,250

pounds of marijuana; (5) information regarding a vehicle stolen by defendant Janice

Goodwin; (6) a 12-pound seizure of marijuana mailed to Chicago, Illinois by Janice

Goodwin and Ralph [last name unknown].  Additionally, Quintanilla provided information

on the activities of several police officers, various justices of the peace and Houston Police

Department officers, information as to two individuals who were a contact and supplier,

respectively, for Morin, and information to the FBI of a pseudo cop murder.  Finally, he

assisted law enforcement with the apprehension of several fugitives.[4]  (D.E. 18, Sealed Aff.

of Wolfe.)

     In addition to this, it was also his conduct that led directly to federal indictments and

ultimately the convictions of two Donna police officers (including the acting Chief of

Police), who were  providing cover and protection to loads of marijuana being hauled

through their jurisdiction.[5]

### 4.     Quintanilla's Alleged Criminal Conduct While Cooperating

     Prior to being indicted, Quintanilla was employed as a bounty hunter.  He was

permitted to continue that employment while cooperating.  Additionally, during the meeting

---

     [4] At the evidentiary hearing, AUSA Mark Patterson informed the Court that the government
did not deny or contest the cooperation as set forth in Wolfe's affidavit.  (EH Tr. at 24.)  Additionally,
as noted by Quintanilla, the government has never challenged Wolfe's affidavit.

     [5] See additional detail regarding the case against the Donna police officers in Section II.A.5
below.

where the cooperation agreement was reached, AUSA Booth had asked Quintanilla if he would assist in the location and apprehension of federal fugitives, some of whom might be located in Mexico.  Quintanilla had agreed.  (D.E. 18, Wolfe Aff. at 2.)

According to the PSR, Quintanilla also engaged in unauthorized or illegal conduct related to his bounty hunting activities during the time that he was cooperating.  The PSR states:

> On November 22, 2001, the defendant along with Roy Montero and Jose Hernandez arrived in Mexico and took possession of a U.S. fugitive wanted in Florida.[6]  The defendant was supposed to arrive in the United States and turn over the fugitive to the U.S. Customs Service.  Instead, the defendant contacted the fugitive's wife and negotiated the release of the fugitive in exchange for $70,000.00.  Mr. Montero was contacted by the defendant a few days after returning from Mexico with the fugitive and was told to meet the fugitive's wife who was going to provide some medical papers.  Mr. Montero met the fugitive's wife and was given $69,753.00.  On November 25, 2001, Mr. Montero gave the defendant the money and was provided $2,000.00 for his help.  [Jose] Hernandez corroborated the trip into Mexico and stated that he last saw the defendant leave with the fugitive after they talked to the fugitive's wife in Edinburg, Texas.  The AUSA advised that the defendant has not been indicted on this conduct because the investigation is on going [sic].  Mr. Montero would be available for testimony in regards to this conduct.

(PSR at ¶ 32.)  This section was listed under the heading "Pending Charges" and was the basis for the Probation Department's recommendation for an obstruction of justice enhancement to Quintanilla's offense level, and the basis for the government's request for

---

6  The fugitive's name was Luis Hernandez.

an upward departure, both of which the Court declined to apply.  (S. Tr. at 138-142.)

In fact, Quintanilla has never been indicted as to this conduct.  Indeed, AUSA Rodriguez[7] testified at the evidentiary hearing that he did not believe the government had enough evidence against Quintanilla to obtain a conviction as to these allegations. (EH Tr. at 152.)  Thus, it was conduct which, to Rodriguez's knowledge at least, has not resulted in anyone being charged. (EH Tr. at 132.)

Although Wolfe disputed the factual allegations in the underlying proceedings,[8] Quintanilla's counsel at the evidentiary hearing stated that he was not going to challenge that the conduct as alleged by the government occurred for purposes of the § 2255 motion.  (EH Tr. at 18) (defense counsel's statement that "I'm not disputing that there was a breach in the sense that I'm not going to be arguing to the Court that there was no law violation that happened.  I'm not going to be claiming that Mr. Quintanilla was innocent of the charge, which he hasn't been prosecuted for to date.").)   That alleged unauthorized conduct is that set forth in the quoted portion of the PSR and also includes the testimony of Roy Montero at Quintanilla's sentencing.  Thus, for purposes of this order, the Court only assumes that Quintanilla in fact received nearly $70,000 in payment from the family of a fugitive wanted by Florida authorities, in exchange for releasing that fugitive from his custody.

---

[7]  AUSA Daniel Rodriguez is based in Houston and works primarily on public corruption cases.  He replaced Booth as the attorney-in charge of Quintanilla's prosecution due to Quintanilla's involvement in Rodriguez's prosecution of Partida and Vigil.

[8]  See D.E. 18, Wolfe Aff. at 2; R. Tr. at 35-39.

5.      **The Partida/Vigil Prosecutions**

As noted above, Quintanilla's cooperation resulted in the indictment and conviction

of two Donna Police Officers, i.e., acting chief of police Partida and patrol officer Vigil.

The efforts expended by Quintanilla in this investigation were considerable, and are

described in detail in the Fifth Circuit opinion affirming Partida and Vigil's convictions and

sentences.  United States v. Partida, 385 F.3d 546 (5th Cir. 2004).  In summary, Quintanilla

had a prior friendship and relationship with Partida, and already had his trust.  As described

by the Fifth Circuit, Quintanilla assisted FBI agents in conducting

> a reverse sting operation centered around Quintanilla, posing as
> a drug dealer, driving an empty vehicle which Partida was told
> would be carrying marijuana loads through Donna.  Quintanilla
> would arrange for Partida, while on duty as a Donna police
> officer, to escort the load vehicle in a marked patrol vehicle to
> a destination outside the Donna city limits.  Once the load
> vehicle reached the city limits, the patrol car would turn around
> and the load vehicle would continue on.  At a later point in
> time, Quintanilla would arrange a location to meet up with
> Partida and perform payment for the services rendered.

Partida, 385 F.3d at 552; (see also EH Tr. at 125 (AUSA Rodriguez, the prosecutor in the

Partida/Vigil case, affirming that the Fifth Circuit's discussion of Quintanilla's cooperation

was accurate).)

As part of the reverse sting operation, FBI agents recorded a series of meetings and

conversations between Quintanilla and Partida relating to the "escort" for the marijuana

loads, and also were able to use a video camera secretly installed on a load vehicle to

12

record the marked patrol vehicles (driven first by Partida and on two other occasions by Vigil) "bumper locked" to the Suburban for several miles as the load vehicle drove through Donna.  During certain recorded conversations, Quintanilla was also able to elicit answers from both defendants showing that they were pre-disposed to engage in this activity, thereby undermining an entrapment defense.

When Partida and Vigil were arrested and shown the videotapes, both immediately signed written confessions.  They subsequently pleaded not guilty and went to trial, asserting an entrapment defense.  The jury convicted Partida of all charges against him, and convicted Vigil of extortion, but acquitted him of conspiracy.  Partida was sentenced to concurrent terms of 151 months incarceration and Vigil was sentenced to 97 months incarceration.  Partida, 385 F.3d at 554.  The Fifth Circuit affirmed their convictions and sentences.  Id. at 567.

AUSA Rodriguez testified during the evidentiary hearing that it was around the same time he was assigned as the prosecutor for the Partida/Vigil investigation that he became aware that Quintanilla was being investigated by the Department of Justice for unauthorized criminal activity, i.e., his alleged conduct in accepting money for the release of a fugitive. (See supra at Section II.A.4. ) Rodriguez testified that after he acquired a good faith belief that Quintanilla had involved himself in criminal activity, he directed that all contact with Quintanilla be terminated by all law enforcement agencies utilizing him in investigations. (EH Tr. at 100-101.)

13

Rodriguez also testified that Quintanilla's unauthorized conduct "harmed" his prosecutions of Partida and Vigil in several ways. First, the government was required to terminate its investigation of Partida and Vigil prematurely. Second, the government had to call an expert witness to document to the jury that the recorded conversations had not been altered at all because the government did not believe it could call Quintanilla to authenticate the recordings. Additionally, Rodriguez believed that the entrapment defense was raised solely because the defendants became aware of the misconduct by Quintanilla. (See EH Tr. at 105-10, 143-45.)

Rodriguez explained that the way that he responded to the entrapment defense was to establish to the jury that the United States was coming before it with clean hands. Rodriguez explained that meant that he had to tell the Partida/Vigil jury that the government would not give any credit to Quintanilla for his assistance, because of his unauthorized conduct. (EH Tr. at 107-08.)

**B.      Criminal Proceedings**

On July 15, 2002, the original charges against Quintanilla were re-filed under cause number C-02-cr-208. (D.E. 1.) At the September 3, 2002 rearraignment, Quintanilla pled guilty to both counts of the new indictment. AUSA Rodriguez informed the Court that the government's position was that there was not a plea agreement. (D.E. 11, Rearraignment Transcript ("R. Tr.") at 4, 10.) Quintanilla's counsel, Wolfe, argued that it would be his position at sentencing that there was a plea agreement, but that his client was going to abide

14

by the promise he made and plead guilty to both counts. (R. Tr. at 11, 12.) Knowing this background, the Court accepted the United States' representations that there was no plea agreement, and made certain to admonish Quintanilla that he did not have a plea agreement. (R. Tr. at 23-27.) The Court also stated its understanding that the law said that only the government could move for substantial assistance, not the defense, and Wolfe indicated that was his "understanding of the law," also. (R. Tr. at 20-21.)

Nonetheless, Wolfe did not ask for a hearing prior to rearraignment as to whether or not there had been a breach of the cooperation agreement, nor did he ask for specific performance of the cooperation agreement. Notably, moreover, Wolfe never argued to the Court that the government had bargained away its discretion as to whether or not to move for a downward departure. Instead, he advised his client to plead guilty (R. Tr. at 23-24), which Quintanilla did. The Court accepted the guilty plea and set the case for sentencing.

On November 15, 2002, Quintanilla's case was called for sentencing. The day before, Wolfe had filed a motion requesting specific performance of the cooperation agreement. The Court made clear that any challenge to the existence of the agreement was past due:

> [I]f there was to be a motion to dismiss the indictment because of some failures of the Government at that point to live up to a plea agreement, or if there was supposed to be some other relief, [then] those matters should have occurred before and not after the plea was given.

(D.E. 20, Transcript of November 15, 2002 call for sentencing ("CS Tr.") at 20.) The

Court did allow Wolfe to file a motion to withdraw the guilty plea.  The Court also ordered the government to file a response to Wolfe's allegations of prosecutorial misconduct.[9]  (CS Tr. at 23-28.)

Shortly thereafter, Quintanilla filed a motion to dismiss the indictment because of prosecutorial misconduct and outrageous government conduct and also a motion to withdraw the guilty plea and enforce the original plea agreement.  (S. Tr. at 4.)  The Court first denied the motion to dismiss the indictment because of prosecutorial misconduct, stating that it was "satisfied" with the response of the government as to why it released information concerning Quintanilla and also emphasizing that Quintanilla's due process rights in the instant case were not affected to a degree that warranted dismissal.  (S. Tr. at 30-36.)

In addressing Quintanilla's motion to withdraw his guilty plea, the Court reiterated the point it made at the first call for sentencing, i.e., that the remedy for the breach of a plea agreement was to seek specific enforcement ___before___ pleading guilty, not to wait until after a guilty plea where the defendant has testified that he understands he's pleading guilty with no agreement.  (S. Tr. at 37-38.)  After reviewing the plea colloquy, the Court denied the motion to withdraw the plea, explaining its reasons in detail.  (S. Tr. at 49-53.)

---

[9] The allegations of prosecutorial misconduct stemmed from the government having disclosed to the media that Quintanilla was an informant in the Partida/Vigil indictments and that he would be appearing in federal court in Corpus Christi on November 15, 2002 to be sentenced on drug trafficking charges.  (See generally CS Tr. at 1-9.)  That information was published in at least two South Texas local newspapers the day before sentencing, which raised serious concerns for Quintanilla about his own safety and protection and the protection of his family.

The Court then proceeded to sentence Quintanilla.  The PSR calculated his base offense level as a 32.  It adjusted his offense level upward by four levels for being an organizer or leader in the offense, pursuant to U.S.S.G. § 3B1.1(a), gave him a two point upward adjustment for obstruction of justice,[10] and declined to give him any reduction for acceptance of responsibility.  (PSR at ¶¶ 17-26.)  This resulted in a total offense level of 38. (PSR at ¶ 26.)  When combined with his criminal history category of I, the resulting guideline  range for imprisonment was 235 to 293 months.  (PSR at ¶ 45.)  Quintanilla's counsel filed several objections to the sentencing report, and Quintanilla filed pro se objections, as well.

At sentencing, the Court determined that it would not upwardly depart as a result of Quintanilla's alleged unauthorized activity with the fugitive Hernandez.  The Court stated its case strongly:

> [I]f the United States believes that he committed an offense against the United States, then prosecute him for that offense and get your points that way, but I don't like uncharged, unconvicted offenses that are not relevant to the crime of commission being used as matters about which I am supposed to increase a defendant's crime – sentence.  It's just too hard. It's just not going to be done, so I'm tired of hearing it.  It's too vaporous.  I'm not doing it.

(S. Tr. at 143.)

---

[10]   The obstruction of justice adjustment stemmed from an allegation by Bocanegra that Quintanilla had threatened him if he spoke to law enforcement. (PSR at ¶ 14.)  Because Quintanilla denied the allegation that he had threatened Bocanegra, the Probation Department also concluded that he had not accepted responsibility for the offense.  (PSR at ¶ 15.)

17

The Court also concluded that, contrary to the PSR's recommendation, Quintanilla was entitled to acceptance of responsibility and should not be given an enhancement for obstruction of justice. (S. Tr. at 143, 171-175.) The Court also disagreed that Quintanilla was a "leader or organizer," but found that he was a manager or supervisor of an organization that had more than five people, and was thus subject to a three-level enhancement for his role in offense. (S. Tr. at 175.) The Court's findings resulted in an total offense level of 32 and a guideline imprisonment range of 121 to 151 months. (S. Tr. at 175.) The defense asked for the bottom end of the guidelines, and the government asked for the top. The Court sentenced Quintanilla to the middle of the guidelines, 132 months imprisonment on each count, to be served concurrently. The Court also imposed a five-year term of supervised release and a $100 special assessment on each count.

As anticipated, the government refused to move for a downward departure. The Probation Officer advised the Court that, if the government had so moved, he would have recommended a six (6) level downward departure based on Quintanilla's assistance. (S. Tr. at 186.) He explained:

> Your Honor, I would like to point out that in my conversations with different agents, I was limited in regards to the information they would release because a lot of stuff was ongoing investigations. But with the limited information that they did provide in a normal or in another case, based on the information that I have, it would amount to a 6-level reduction because people have been arrested. People have been indicted. Seizures have been made – seizures of contraband, seizures of money. And that is paramount to a 6-level reduction, Your

18

Honor, according to our office.

(S. Tr. at 186.)  Given the posture of the case, however, and the government's failure to ask

for a downward departure, the Court found itself constrained and unable to offer that relief.

(S. Tr. at 190-91.)

Quintanilla timely appealed.  (D.E. 33.)  He was appointed new counsel on appeal,

and that counsel filed an Anders[11] brief, to which Quintanilla responded and moved for new

counsel.  (D.E. 56 at 1.)  The Fifth Circuit affirmed in a per curiam opinion issued on

February 18, 2004.  (D.E. 55, 56.)   The appellate court's opinion concluded:

> Quintanilla's contention that his previous counsel was
> ineffective for not advising him to withdraw his guilty plea is
> not sufficiently developed in the record before us.  Therefore,
> as to that contention only, Quintanilla's appeal is DISMISSED
> without prejudice to his ability to raise that contention in a
> motion pursuant to 28 U.S.C. § 2255.

(D.E. 56 at 2 (citation omitted).)

Quintanilla did not file a petition for writ of certiorari.   Quintanilla filed the instant

§ 2255 motion on May 17, 2005.  It is timely.[12]   The Court held an evidentiary hearing on

August 23, 2006 to fully develop the record as to Quintanilla's allegations.  (D.E. 87.)

---

[11]  Anders v. California, 386 U.S. 738 (1967).

[12]  The Clerk received Quintanilla's motion on May 23, 2005.  The motion is dated May 17, 2005, however, and also contains a certification that it was delivered to prison authorities for filing, on the same date.  It is thus deemed filed as of the earlier date. See Houston v. Lack, 487 U.S. 266, 276 (1988) (a document is deemed filed by a *pro se* prisoner when it is delivered to prison authorities for mailing, postage pre-paid); United States v. Young, 966 F.2d 164, 165 (5th Cir. 1992) (providing benefit of Houston v. Lack to *pro se* prisoner in § 2255 proceedings).

19

### C.    Evidentiary Hearing

At the evidentiary hearing, Quintanilla was represented by appointed counsel Gonzalez-Falla. Quintanilla agreed with his counsel's statement that he was abandoning all but his first ground for relief in his original § 2255 motion. In the sole remaining ground for relief, Quintanilla asserts that he was denied effective assistance of counsel because his counsel, Wolfe, allowed him to plead guilty without first arguing to the Court that the government had bargained away its discretion as to whether to move for a downward departure and without first asking for specific performance on the agreement on this ground. In support of his motion, Quintanilla offered the affidavit testimony of Wolfe, in which Wolfe himself asserts that he should not have allowed his client to plead guilty without first challenging the government's breach of the agreement.

At the evidentiary hearing, the only witnesses were AUSA Booth and AUSA Rodriguez. The pertinent portions of their testimony have been discussed in the factual background above.

## III.  DISCUSSION

### A.    Ineffective Assistance of Counsel

An ineffective assistance of counsel allegation presented in a § 2255 motion is properly analyzed under the two-prong analysis set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984). <u>United States v. Willis</u>, 273 F.3d 592, 598 (5th Cir. 2001). To prevail on a claim of ineffective assistance of counsel, a movant must

20

demonstrate that his counsel's performance was both deficient and prejudicial.  Id.  This means that a movant must show that counsel's performance was outside the broad range of what is considered reasonable assistance and that this deficient performance led to an unfair and unreliable conviction and sentence.  U.S. v. Dovalina, 262 F.3d 472, 474-75 (5th Cir. 2001).

## B.      The Prejudice Prong – Government's Alleged Breach of the Plea Agreement

To ascertain whether Quintanilla suffered any prejudice as a result of counsel failing to comprehensively challenge the breach of the cooperation agreement *prior* to him pleading guilty, the Court must determine whether, if such a challenge had been made prior to the plea, it would have had a reasonable probability of altering the outcome of Quintanilla's case.

### 1.      Undisputed Facts

Although there is much factual and legal discussion in the filings by the parties, most of the pertinent facts and the applicable legal standards are not in dispute.   For example, for purposes of his § 2255 motion, Quintanilla's counsel has stated that he is *not* arguing that Quintanilla did not violate the law while cooperating, nor is he arguing his "innocence" of the alleged law violation.  (EH Tr. at 18.)  Thus, at least for purposes of his claim of ineffective assistance of counsel, the Court can assume that Quintanilla engaged in the conduct as alleged by the government, i.e., that he accepted a $70,000 payment from a fugitive's family and then returned that fugitive to his family instead of returning him to the

authorities.  Similarly, all of the cooperation rendered by Quintanilla, discussed in Section II.A.3. <u>supra</u>, is not disputed by the government. (EH Tr. at 24.)

It is also undisputed that there was, in fact, a cooperation agreement.  (<u>See</u> supra at page 7.)  As to the terms of such agreement, the parties seem to generally agree that the agreement required Quintanilla to render assistance and cooperation to the government, in exchange for which the government would move for a reduction in his sentence for substantial assistance.   The parties also agree that the agreement required Quintanilla not to commit additional crimes or to "stay out of trouble" while he was cooperating.  (<u>See</u> D.E. 99 at 4 (government citing Booth's testimony at the evidentiary hearing (EH Tr. at 56) for the proposition that "[i]mplicit in the cooperation agreement was that Quintanilla would not violate the law and would stay out of trouble."); D.E. 98 at 4 (Quintanilla's attorney noting same).)

## 2.   The Government Bargained Away Its Discretion To Move For a Downward Departure

The primary dispute as to the terms of the agreement is whether the government bargained away its discretion as to whether or not to move for a downward departure.  In this case, this question is complicated by the fact that there was no written agreement. AUSA Booth's testimony on this point cuts both ways.

On the one hand, she testified that she never relinquished the government's discretion to file a motion for downward departure.  (EH Tr. at 91-92.)  She also testified that Wolfe

"knew" it would be a matter of prosecutorial discretion whether or not to file a motion for downward departure.  (EH Tr. at 83-84.)

On the other hand, however, she testified that there was an implied understanding that Quintanilla "was cooperating so he could reduce his sentence and that [she] would file a motion for 5K if he did what he was supposed to."  (EH Tr. at 90.)  She also testified that it was implied that "if he cooperated, did everything he was supposed to do and, you know, stayed a good boy that [she] *would definitely* file a motion for a downward departure when we got to sentencing."  (EH Tr. at 91 (emphasis added).)  She also emphasized that Morin was a "significant" target and that corrupt police officers also would be significant.  (EH Tr. at 74.)   Likewise, AUSA Rodriguez was asked "[If Quintanilla] had provided substantial assistance then a motion for downward departure *would* be filed, correct?"  He responded:  "Absolutely, I'm agreeing with that."  (EH Tr. at 180.)

Having reviewed the entirety of the record, the Court concludes that in this case the government did not retain sole discretion under the oral cooperation agreement as to whether or not to file a 5K1.1 motion.  See United States v. Hernandez, 17 F.3d 78, 83 (5th Cir. 1994) (remanding to district court to determine whether government bargained away its discretion by stating that "[i]f [Hernandez provides assistance, the government may make a motion for downward departure at the time of sentencing," and noting that "we have serious doubts that either party meant for the government to retain unbridled discretion merely by using that word."); United States v. Watson, 988 F.2d 554, 553 (5th Cir. 1993)

23

(because case was a "unique" one in that the government did not explicitly reserve the discretion to determine whether to file a § 5K1.1 motion, the district court must "specifically enforce the plea agreement if it finds that the government breached it"); see also United States v. Price, 95 F.3d 364, 368 & nn.2-3 (5th Cir. 1996) (collecting cases where language of plea agreement indicated surrender of discretion and cases where plea agreement retained sole discretion).

If the government had retained that discretion, then the Court could only assess whether the government relied upon an unconstitutional motive in refusing to file the motion. United States v. Garcia-Bonilla, 11 F.3d 45 (5th Cir. 1993).[13]  Because, however, the government bargained away its discretion, the Court must consider whether there was in fact substantial performance of the agreement by Quintanilla, such that the government's failure to move for a downward departure constituted a breach of the agreement.  Price, 95 F.3d at 368 (in cases where the government has bargained away its discretion, "the only remaining inquiry is whether the aid rendered by the defendant constitutes substantial assistance as that term was reasonably understood by the parties at the time that they entered into the plea agreement.").[14]

--------

[13]  This is precisely what the Court believed at sentencing, because Wolfe never argued to the Court that the government had bargained away its discretion.

[14]  As the government points out, the Court reviewed the issue of whether the government was required to make a downward departure at sentencing.  At that time, the Court said that it believed the government was "justified" in not pursuing a motion for substantial assistance. (S. Tr. at 191.)  The case was before the Court in a strikingly different posture at sentencing, however.  At that point, Quintanilla was seeking to withdraw his plea.  The Court could not allow a withdrawal on t his

### 3.     Quintanilla's Unauthorized Conduct Did Not Relieve the Government of Its Obligation To Move for a Downward Departure

In determining whether Quintanilla's alleged violation of law released the government from its obligations under the cooperation agreement, the Court is guided by <u>United States v. Castaneda</u>, 162 F.3d 832 (5th 1998).  The defendant in <u>Castaneda</u> had a nonprosecution agreement with the government.  Under the oral agreement, the defendant agreed to provide full and truthful disclosure of information implicating another individual involved in the same bribery scheme, and also to provide information about the illegal activities of a second individual.  162 F.3d at 834 & n.3.  In exchange, the government promised not to prosecute the defendant for his role in the scheme.  <u>Id.</u> at 834, 836.

Through two different debriefings, the defendant provided a substantial amount of information to the government as to the two individuals, and also identified eight other individuals as being involved in the scheme or having knowledge of it.  <u>Id.</u> at 834.  Almost one year after the second debriefing, the government wrote to Castaneda advising that it believed he had breached the agreement by failing to reveal to the government "relevant and material information ... of which he was well aware."  <u>Id.</u> at 835, 837.  It then prosecuted

---

ground, however, because Quintanilla had pleaded guilty with the specific understanding that the government did not believe it had any agreement with him and knowing the government's position that it did not intend to move for a downward departure.

    Additionally, Quintanilla's counsel failed at that time to bring to the Court's attention or to argue that the government had bargained away its discretion as to whether or not to move for a downward departure.  Thus, the Court's understanding was that it had a defendant before it who had pleaded guilty knowing he had no plea agreement and no obligation from the government to recognize any assistance he had provided.  The Court's comments at sentencing, therefore, are not dispositive of the issue.

him.  The district court denied Castaneda's motion to dismiss the indictment based on the oral nonprosecution agreement.  Castaneda was found guilty after a jury trial and was sentenced by the Court.  On direct appeal, Castaneda argued that the district court erred in denying his motion to dismiss the indictment.  Id. at 835.  The Fifth Circuit agreed and remanded the case with instructions for the district court to enter a judgment of acquittal. Id. at 840.

In addressing Castaneda's claim, the Fifth Circuit first noted that, like a plea agreement, a nonprosecution agreement must be interpreted in accordance with the principles of contract law and that the government is bound to perform its promises unless there is a material breach by the defendant.  Id. at 835-36.  The court explained:

> When the government believes that a defendant has breached the terms of a nonprosecution agreement and wishes to be relieved of performing its part of the bargain – here, refraining from prosecuting the defendant – due process prevents the government from making this determination and nullifying the agreement unilaterally.  Instead, the government must prove to the court by a preponderance of the evidence that (1) the defendant breached the agreement, and (2) the breach is sufficiently material to warrant rescission.

Id. at 836.

Castaneda argued that his omissions were essentially inadvertent or duplicative and thus did not constitute a material breach of the agreement.  Id. at 837.  That is, "he argued substantial performance."  Id.  Again looking to general contract law, the Fifth Circuit held:

> [A] breach is not material unless the non-breaching party is

26

> deprived of the benefit of the bargain.  The less the non-breaching party is deprived of the expected benefits, the less material the breach.

Id. at 837 (internal footnotes omitted).  Similarly, the "converse" concept of substantial performance should also be applied.  That is, "if a party's 'nonperformance ... is innocent, does not thwart the purpose of the bargain, and is wholly dwarfed by that party's performance,' the breaching party has substantially performed under the contract, and the non-breaching party is not entitled to rescission."  Id. at 838 (internal citation in footnote omitted).

Thus, in the case before it, the Castaneda court reviewed the assistance and information delivered by the defendant and compared it with the alleged omissions.  The court found that "given the government's burden of proof, ... the relatively insignificant omissions by Castaneda did nothing to frustrate the government's prosecution of the first individual.  Moreover, these omissions pale by comparison to the plethora of information delivered by Castaneda."  Id. at 838.

Applying the principles in Castaneda to the instant case, the Court concludes that Quintanilla's alleged violation of the agreement did not thwart the purpose of the bargain, and are wholly dwarfed by his cooperation under the oral cooperation agreement.

The contributions that Quintanilla made to the Virgil/Partida were enormous.  Indeed, one could argue that, absent his relationship with those defendants (one built over time that had a high level of trust) and his conduct in working in an undercover capacity in

videotaping and recording, those individuals would not have been prosecuted at all. Moreover, while the government was put to its burden of proof at trial and AUSA Rodriguez claims that fact was a result of Quintanilla's later law violation, both defendants were convicted and sentenced to lengthy prison sentences of 97 months and 151 months, respectively.  Additionally, the government knew prior to indicting Virgil and Partida that it was not going to use Quintanilla, because Quintanilla had been indicted months before. (EH Tr. at 130-131.)

AUSA Rodriguez himself acknowledged that Quintanilla's wrongdoing did not "frustrate" the prosecutions of Partida or Vigil, but only "impacted and weakened" the government's case.  AUSA Rodriguez also testified that but for Quintanilla's identification of the Donna police officers, the United States would have been unable to initiate the investigation against them.  Given this background, if the Court were looking only at the contributions to that one case, on the one hand, and comparing it to Quintanilla's illegal conduct, on the other, it would conclude that Quintanilla's contributions were overshadowed by his illegal conduct, which was not innocent, and which did make the government's prosecution of the two individuals more problematic, although it did not completely thwart it.

In this case, however, Quintanilla's contributions reached far beyond the Partida /Virgil prosecutions.   His cooperation in  various operations led to several large drug seizures, the arrests of various individuals, and at least one other conviction.  Additionally,

although Morin was – and remains – a fugitive, Quintanilla was critical in obtaining an indictment against him.[15]

Quintanilla's breach was far more serious than the defendant's in Castaneda.  The Court noted at sentencing that it believed that Quintanilla had engaged in improper or unlawful conduct. (S. Tr. at 178.)  Nonetheless, it is striking that Quintanilla still has not been charged with or indicted as a result of that conduct.  Indeed, the government has still not identified to the Court any specific federal or state crime that he committed.

The Court also finds that Quintanilla's contributions were far more significant than Castaneda's.  The defendant in Castaneda simply provided information already within his knowledge.  By contrast, Quintanilla worked in an undercover capacity for a lengthy amount of time, placing both himself and potentially his family in danger.  As noted, his cooperation resulted in two convictions of corrupt police officers on federal charges, several large drug seizures, the arrest and indictment of a large drug trafficker, other arrests, a conviction for a drug crime, and substantial information being provided to the authorities.

In reviewing all these circumstances, the Court concludes that Quintanilla's allegedly unauthorized conduct did not thwart the purpose of the bargain, that the government obtained the benefit of its bargain, and that Quintanilla's cooperation overshadowed his allegedly and somehow unauthorized conduct.  See Castaneda, 162 F.3d at 838; cf. United

---

[15]  Additionally, it appears that the government released Morin after his indictment so that he could cooperate.  It was after this that he fled.  (S. Tr. at 183-84)  Certainly, then, it is not Quintanilla's doing that Morin became – and apparently remains – a fugitive.

States v. Davis, 393 F.3d 540, 547 (5th Cir. 2004) (applying Castaneda and holding that the defendant's failure to give certain information to the government was material because it was not innocent, his conduct contravened the very purpose of the plea agreement, his breach was not "wholly dwarfed" by the information he provided, and the government did not receive the benefit of its bargain).

On the issue of the government's breach, it is worth noting that both Booth and Rodriguez acknowledged that, when determining whether to move for a downward departure based on substantial assistance, a prosecutor must look at the seriousness of the defendant's charged offense, the level of cooperation given and results of the cooperation for the government, and the seriousness of any unauthorized conduct by the defendant while cooperating. (EH Tr. at 77-81; EH Tr. at 104-05, 115.) Notably, however, that process was not followed in this case. That is, although AUSA Rodriguez claims that consideration was given as to Quintanilla's assistance, he admitted at the evidentiary hearing that he did not review the contributions made by Quintanilla, other than those that directly affected his own prosecutions of Partida/Vigil. Rather, Rodriguez testified that his "focus was simply in deciding whether [Quintanilla] he had provided substantial assistance in cases that [Rodriguez] was handling." (EH Tr. at 161.)

Near the end of the evidentiary hearing, Rodriguez disclosed what appears to be his true motive in refusing to make a downward departure for Quintanilla. Rodriguez testified: "My driving force in not giving him a 5K was trying to assure that I maximized the

30

Government's position in front of any jury that involved his involvement in a case." (EH Tr. at 186.)

To be able to tell a jury that a cooperating witness would not be getting a reduction in sentence for his cooperation would obviously be advantageous to the prosecutor in every case. That alone, however, is not a reason to refuse to make a motion under U.S.S.G. § 5K.1 where the discretion to do so has been bargained away. Rather, the government has an obligation to review all of the cooperation provided by a defendant, to review any alleged legal violations, and to determine in good faith whether a motion for substantial assistance is warranted. The Court is troubled by the apparent failure to do so in this case, although its conclusions herein are not based on this failure.

In any event, having found that the government breached its agreement by not moving for a downward departure, the Court finds that Quintanilla has established the prejudice prong of Strickland. That is, had his counsel sought specific performance of the agreement prior to allowing him to plead guilty and, in particular, argued that the government had bargained away its discretion, there is a "reasonable probability" that the result of the proceeding would have been different.

## C.     The Deficiency Prong

The Court also finds that Quintanilla has established that his counsel was deficient. While the Court does not view the conduct of counsel with the benefit of hindsight, United States v. Faubion, 19 F.3d 226 (5th Cir. 1994), "a reasonable attorney has an obligation to

research relevant facts and law." United States v. Williamson, 183 F.3d 458, 462-63 (5th Cir. 1999). "Solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention." Id.

In this case, Quintanilla's counsel never argued to the Court that the government had bargained away its discretion as to whether or not to file a downward departure motion, and the precedent discussed herein clearly spoke to this issue. Moreover, Wolfe himself admits that he should have pursued the issue of specific performance **before** allowing his client to plead guilty. As the Court emphasized at the rearraignment, any attempt to force the government to downwardly depart at sentencing, after admitting that there is no plea agreement, is extremely difficult and unlikely to succeed. Particularly given the Court's warnings, Wolfe should have insisted on a hearing seeking specific performance prior to allowing his client to plea. Mr. Wolfe is an excellent attorney, but his conduct in this case was deficient. Quintanilla stood virtually no chance of obtaining a downward departure after his attorney allowed him to plead guilty. Instead, his attorney should have first sought specific performance of the agreement and argued that the government's discretion had been bargained away. Then, had the Court denied his motion, he could have allowed the rearraignment to go forward.

## D.   The Proper Remedy

Having found that Quintanilla was denied effective assistance of counsel, the Court concludes that the proper remedy is specific enforcement of the agreement and resentencing.

32

This remedy is appropriate because, had his counsel argued to the Court prior to the plea that Quintanilla was entitled to specific performance of the agreement, the Court would have required the government to make a motion for downward departure at sentencing. Thus, the Court hereby ORDERS that the government file a motion for a downward departure based on Quintanilla's substantial assistance. The government shall file its motion for downward departure not later than thirty days after the entry of this Order. Once filed, the Court will then hold a resentencing hearing, at which time it will be able to evaluate the assistance given by Quintanilla in detail and determine an appropriate sentence.

## IV. CONCLUSION

The Court emphasizes that its ruling herein is limited to the specific facts of this atypical case. Indeed, there are several factors that differentiate this particular case from the usual one in which a defendant claims he has provided substantial assistance and the government refuses to move for a downward departure. First, the parties agree that there was only an oral cooperation agreement, and the Court has found that the government bargained away its discretion as to whether or not to move for a downward departure. Thus, the agreement at issue differs from the typical plea agreement scenario, at least in this Division, where the government explicitly retains sole discretion as to whether or not to move for a downward departure for substantial assistance.

Second, Quintanilla is a defendant whose cooperation went beyond the norm and whose continued cooperation more than substantially benefitted the government. The initial

indictment against him was dismissed so that he could assist the government.  The parties anticipated that he would be re-indicted in three months.  Instead, he provided cooperation over the course of approximately 17 months, working in a potentially dangerous capacity. His cooperation resulted in the federal convictions of two corrupt police officers, several large drug seizures, the arrests and convictions of several other individuals related to lesser offenses, and the indictment of an individual with a substantial role in a drug trafficking ring.  Moreover, the government does not dispute that the cooperation he provided was substantial.

Third, the alleged breach of the agreement by Quintanilla is that he committed a crime that has never been identified to this Court and for which he has never been charged. Additionally, AUSA Rodriguez has testified that he did not believe the government had enough evidence against Quintanilla to obtain a conviction as to these allegations.  (EH Tr. at 152.)  While it is not required that the government be able to indict an individual before concluding that the individual has violated the terms of a cooperation or plea agreement, the Court finds that, in this case, this fact lessens the impact of Quintanilla's unauthorized conduct.

Accordingly, for the reasons discussed in this Memorandum Opinion and Order, Quintanilla's motion to vacate sentence is GRANTED and Quintanilla's sentence is hereby vacated.  The government is ordered to file a motion for downward departure based on Quintanilla's substantial assistance within thirty days after the entry of this Order.  A

hearing will be held to resentence Quintanilla, at which the parties may present their views on an appropriate sentence.  Defendant is ordered to be present.


      ORDERED this 26th day of August, 2007.


                                      HAYDEN HEAD
                                      CHIEF JUDGE